101 F.3d 414
 MULBERRY SQUARE PRODUCTIONS, INCORPORATED, a Mississippi
Corporation, Plaintiff-Appellant,
v.
STATE FARM FIRE AND CASUALTY COMPANY, Does 1 through 100,
Inclusive, Defendant-Appellee.
 No. 95-60679.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 12, 1996.
 
 Andrew N. Alexander, III, Shawn N. Sullivan, Lake, Tindall & Thackston, Greenville, MS, George E. Hedges, Hedges & Caldwell, Los Angeles, CA, for plaintiff-appellant.
 Harry R. Allen, Elizabeth Colette Towles, Allen, Vaughn, Cobb & Hood, Gulfport, MS, for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before BENAVIDES, STEWART and DENNIS, Circuit Judges.
 STEWART, Circuit Judge:
 
 
 1
 This case arises out of a movie deal gone bad. At the center of the controversy is the lovable star canine character we all know as Benji TM. But this case is not about Benji TM himself. Rather, we must decide whether State Farm Fire and Casualty Company (State Farm) had a duty to defend the owner of the intellectual property rights in Benji TM for alleged wrongful conduct. The district court granted State Farm's motion for summary judgment, holding that State Farm had no duty to defend the plaintiffs for counterclaims the district court believed arose from a breach of contractual duties. The plaintiffs appeal. We affirm, but for slightly different reasons than those articulated by the district court.
 
 FACTS
 A. The Three Players
 
 2
 We begin by introducing the players to this controversy. Mulberry Square Productions, Incorporated (Mulberry), a Mississippi corporation, developed, produced, and marketed family entertainment from 1990 to 1994. Mulberry holds trademark rights in Benji TM and is the owner (in two instances, the co-owner) of all copyrighted works portraying the character Benji TM. Mulberry is owned by Joseph (president) and Carolyn Camp (vice president).
 
 
 3
 H.P. Films, Incorporated (HP Films), a Florida corporation, engaged in the business of film financing, production, distribution, and exploitation. The record suggests that the two persons affiliated with HP Films, and who were involved in the underlying movie deal, were relatively inexperienced in the movie industry.
 
 
 4
 Vision International (Vision), a California corporation, is a film financing, production, distribution, and exploitation company specializing in the distribution of films made in the United States to foreign theater markets. Vision was a widely known company within the entertainment industry.
 
 
 5
 B. The Deal to Produce a Motion Picture Starring Benji TM--A Tale of Deception and Double-Dealing
 
 
 6
 Sometime in the summer of 1992, agents for HP Films met with the Camps (who represented Mulberry) in Florida to discuss a movie starring Benji TM entitled HOME FOR CHRISTMAS. At that meeting, Joe Camp explained the unique characteristics of the Benji TM character, his concern over creative controls, and Mulberry's requirements for use of the Benji TM character and trademark. HP Films's agents told the Camps that they were in agreement with the Camp's representations regarding Benji TM; that they were interested in producing a family film; that they liked the HOME FOR CHRISTMAS screenplay; and that they had a distribution agreement with Vision, who would have the right to distribute the film to foreign markets. HP Films's agents stated that Vision would have no rights to request revisions or rewrites, and that once Vision approved the screenplay, financing for the film would be in place.
 
 
 7
 The Camps returned home and a term sheet was drafted which represented the agreement of the parties pending a more detailed long-form contract. A signed version of the term sheet was completed by September 18, 1992.
 
 
 8
 HP Films promptly engaged in double-dealing and deception in an effort to wrest away from the Camps the rights to Benji TM. The agents for HP Films met with Vision's representative, who did not like the HOME FOR CHRISTMAS screenplay. HP Films then began to tinker with the story line. Without the Camp's consent, in October 1992, at an international film festival held in Milan, Italy, one of HP Films's agents marketed the HOME FOR CHRISTMAS screenplay under the title "BENJI'S NIGHT OUT."."[1] HP Films was ultimately unsuccessful in securing funding for HOME FOR CHRISTMAS or any other rendition of Camp's screenplay.
 
 
 9
 Although unaware of HP Films's and Vision's plans, Joe Camp refused to make the script changes in HOME FOR CHRISTMAS that would have made the film more appealing in foreign markets. In an effort to accommodate Vision and HP Films, however, Joe Camp proposed a new film titled BENJI-BENJI, although the script had not yet been written. The term sheet was correspondingly modified to reflect this change, satisfy Vision, and make it possible to procure a financing guarantee. Under the amendment, the Camps retained the same creative and character control they had under the original term sheet. An important provision within the amendment read as follows:
 
 
 10
 In the event [HP Films] has paid the full amount of $250,000 for the services of CAMP in connection with the NEW SCREENPLAY, all right, title and interest in and to the NEW SCREENPLAY and the copyright therein shall pass to [HP Films;] however, [HP Films] must utilize the services of CAMP, C. CAMP and JOE CAMP III for any production based upon the NEW SCREENPLAY, subject to the CAMPS first availability, and [HP Films] must acquire the BENJI RIGHTS for the NEW SCREENPLAY, all for the same compensation and on the same terms as set forth herein.
 
 
 11
 The amendment was signed on December 2, 1992.
 
 
 12
 On December 4, 1992, Joe Camp traveled to Los Angeles and made a detailed scene-by-scene presentation of BENJI-BENJI to Vision and HP Films. Vision and HP Films approved the presentation, subject to minor changes to which Joe Camp agreed.
 
 
 13
 C. Nepotism, Acrimony, a Lawsuit, and a Counterclaim--Enter State Farm
 
 
 14
 Under the terms of the agreement between the parties, Carolyn Camp was principally responsible for casting. One of HP Films's agents suggested that his thirteen-year-old daughter, Ariana, be cast in the role as the feature character. Because Joe Camp had envisioned an eight-year-old girl to play the part, Carolyn Camp rejected Ariana for the part.
 
 
 15
 The relationship between the parties soured considerably in February 1993. The Camps traveled to Los Angeles to attend a "Vision Day" luncheon at which Vision was presenting a gala for prospective foreign buyers. The Camps understood that BENJI-BENJI would be introduced. While in Los Angeles, at the request of Vision and HP Films, the Camps met with Ariana. At that time, the Camps reiterated their position that Ariana was too old for the feature part.
 
 
 16
 The Camps then discovered that HP Films had assisted Vision in running a full-page advertisement in Variety Weekly that failed to give the appropriate copyright credits to Joe Camp and Mulberry and that was not approved by the Camps. Ariana's father also informed the Camps that his daughter was going to play the feature role in the film whether the Camps liked it or not; that Ariana was invited to the luncheon so that she could be announced at the luncheon; that Joe Camp would be replaced as the screenwriter for BENJI-BENJI; and that Joe Camp would be fired as the director of the film. Enraged, the Camps canceled their plans to attend the luncheon and immediately left Los Angeles.
 
 
 17
 Mulberry thereafter sued Vision and HP Films. Vision and HP Films counterclaimed, alleging breach of contract, tortious interference with contract, and tortious interference with prospective economic advantage. Mulberry's suit against HP Films and Vision is not the subject of this appeal. Rather, this appeal concerns the counterclaims asserted against Mulberry. Specifically, Mulberry demanded that its insurer, State Farm, defend Mulberry in the counterclaims pursuant to Mulberry's comprehensive business liability policy.[2] State Farm refused to provide coverage on the ground that the allegations in the counterclaims did not trigger coverage under the policy.
 
 
 18
 Meanwhile, Mulberry's lawsuit against HP Films and Vision was submitted to arbitration. In a lengthy, comprehensive report, the arbitrator ruled in favor of Mulberry. The arbitrator examined all of the documents submitted by the parties and concluded that "[t]he Camps and [HP Films] intended to be bound by the writings." Arb. Report & Decision, para. 18. In other words, a contract existed between Mulberry and HP Films, such that
 
 
 19
 the Camps, by the writings, granted a conditional license to [HP Films] to produce theatrical films using the character BENJI. The Camps did not assign to [HP Films], or in any other way transfer to [HP Films], expressly or by implication, the entire bundle of rights, both under the copyright and trademark laws of the United States, nor under the common law, relating to intellectual property with respect to BENJI.
 
 
 20
 Arb. Report & Decision, para. 27.1. The arbitrator concluded that HP Films materially breached the contract and that HP Films was not entitled to recover under its counterclaims against Mulberry.
 
 
 21
 THE COUNTERCLAIMS AND THE RELEVANT POLICY PROVISIONS
 
 
 22
 Approximately one year after the arbitrator rendered its decision in favor of Mulberry, Mulberry filed suit against State Farm in the Southern District of Mississippi, claiming that State Farm, in bad faith, refused coverage and a defense to the counterclaims filed against Mulberry. State Farm moved for summary judgment, claiming that it had no duty to defend or indemnify Mulberry for the allegations in the counterclaims. Before we present the district court's ruling on State Farm's motion, we first present the portions of the counterclaims and provisions of the State Farm policy that are at issue in this case.
 
 A. The Counterclaims
 
 23
 Because Mulberry did not claim that the breach of contract counterclaims triggered coverage under the business policy, we concern ourselves here with only the two purported tort counterclaims asserted by HP Films and Vision. We lay out in some detail the allegations of the counterclaims because they form the basis for our analysis and decision.
 
 
 24
 Paragraphs 16, 17, 18, and 19 summarize the allegations that form the basis of the counterclaims for tortious interference with contract and tortious interference with prospective business advantage. They provide as follows:
 
 
 25
 16. HP is informed and believes that counterdefendants ... have engaged in the following acts and refusals to act:
 
 
 26
 (a) JOE CAMP's refusal and failure to timely render his writing services in connection with the New Benji Screenplay;
 
 
 27
 (b) JOE CAMP's refusal and failure to make a previously scheduled promotional appearance in connection with VISION's marketing and distribution of the New Picture; and
 
 
 28
 (c) Counterdefendants' refusal and failure to perform any of their obligations under the Production Agreement subsequent to Counterdefendants' filing of the First Amended Complaint.
 
 
 29
 17. Counterdefendants' acts and refusals to act, as alleged in Paragraph 15 [sic ] hereof, constitute breaches of the Production Agreement.... HP is informed and believes that Counterdefendants' willful and wrongful breaches of the Production Agreement have been undertaken with the intent to delay, forestall and suspend production of the New Picture in order to wrongfully wrest creative control over the production, marketing and distribution of the New Picture from HP ...
 
 
 30
 18. HP is informed and believes that Counterdefendants knew and intended that their wrongful actions would so cloud the status of HP's rights to use the BENJI character and the New Benji Screenplay in order to prevent and delay HP and VISION from obtaining the financing necessary to go forward with production....
 
 
 31
 19. HP is informed and believes that Counterdefendants' actions were taken with the knowledge and intent that such actions would force HP and VISION to terminate or modify to their disadvantage their financing agreements and their presale agreements with various foreign distributors. Such acts materially have injured HP's and VISION's reputation in the film industry....
 
 
 32
 Emphasis added. Paragraphs 29 and 30 of HP Films's counterclaim set forth HP Films's theory of liability on their tortious interference with contract claim. They provide as follows:
 
 
 33
 29. HP is informed and believes that Counterdefendants knew of the contractual relationships between VISION and HP, between HP and certain or all of the aforesaid third parties, and between VISION and its foreign distributors, and that Counterdefendants intended to interfere with such relationships by their willful, bad faith and malicious breach of their Production Agreement with HP and by their efforts to forestall and suspend production of the New Picture in order to gain creative control to which they are not contractually entitled.
 
 
 34
 30. In willfully and wrongfully breaching the Production Agreement, ... Counterdefendants clearly intended that their actions would disrupt, or cause breach or cancellation of, or render more difficult or burdensome the performance of HP's and VISION's Sales Agency Agreement, HP's aforesaid financing, production and distribution agreements with third parties, and VISION's licensing agreements with foreign distributors relating to the New Picture.
 
 
 35
 Emphasis added. Paragraphs 31 and 32 specify the damage to HP Films that was allegedly caused by Mulberry's purported tortious interference with HP Films's contracts. Of the many damages HP Films claimed they suffered, HP Films claimed "harm to [their] reputation in the entertainment industry...." Para. 32.
 
 
 36
 Paragraph 35 of HP Films's counterclaim for tortious interference with prospective economic advantage states HP Films's theory of liability on that claim. It provides as follows:
 
 
 37
 35. HP is informed and believes that Counterdefendants intentionally have prevented HP and VISION from concluding financing agreements, production agreements, [and] licensing agreements with these foreign distributors and other distribution agreements relating to a variety of crucial media and territories, as well as preventing HP from pursuing the merchandising, publishing and commercial tie-in opportunities to which it is entitled under the Production Agreement, by halting the production of the New Picture, in a calculated and cynical effort to gain absolute creative control over the production to which they are not entitled.
 
 
 38
 Emphasis added. Paragraph 37 also states that liability "include[s] but [is] not limited to [Mulberry's] willful and malicious actions in breaching the Production Agreement and its calculated and wrongful efforts to bring production to a standstill...."
 
 
 39
 Vision's counterclaims against Mulberry are virtually identical to those of HP Films. The allegations in paragraphs 16-19 of Vision's counterclaim are identical to paragraphs 16-19 in HP Films's counterclaim. Paragraphs 30 and 31 of Vision's counterclaim for tortious interference with contract states the following:
 
 
 40
 30. Vision is informed and believes that counterdefendants knew of the contractual relationships between Vision and HPF and between Vision and its foreign distributors and that counterdefendants intended to interfere with such relationships by their willful, bad faith and malicious breach of their Production Agreement with HPF ... and by their efforts to forestall and suspend production of the Picture in order to gain creative control to which they are not contractually entitled.
 
 
 41
 31. In willfully and wrongfully breaching the Production Agreement as alleged above, counterdefendants clearly intended that their actions would disrupt, or cause breach or cancellation of, or render more difficult or burdensome the performance of Vision's Sales Agency Agreement with HPF and Vision's licensing agreements with foreign distributors relating to the Picture.
 
 
 42
 Emphasis added. Paragraph 33 sets out the damages Visions claimed it suffered as a result of Mulberry's conduct. According to Vision, it suffered "harm to [its] reputation in the entertainment industry...." Paragraphs 36 and 38 of Vision's counterclaim for tortious interference with prospective economic advantage states the factual predicate of Vision's claim as follows:
 
 
 43
 36. Vision is informed and believes that counterdefendants intentionally have prevented Vision from concluding licensing agreements with these foreign distributors by halting the production of the Picture in a calculated and cynical effort to gain absolute creative control over the production to which they are not entitled.
 
 
 44
 * * * * * *
 
 
 45
 38. As a result of counterdefendant's willful and malicious conduct, including but not limited to its willful and malicious actions in breaching the Production Agreement and its calculated and wrongful efforts to bring production to a standstill, Vision is entitled to punitive and injunctive relief....
 
 
 46
 Emphasis added.
 
 B. The Business Liability Policy
 1. What's Covered
 
 47
 Mulberry's comprehensive business liability policy provides:
 
 
 48
 We will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury, property damage, personal injury or advertising injury to which this insurance applies.... This insurance applies only:
 
 
 49
 1. to bodily injury or property damage caused by the occurrence which takes place in the coverage territory during the policy period;
 
 
 50
 2. to personal injury caused by an occurrence committed in the coverage territory during the policy period. The occurrence must arise out of your business, excluding advertisements, publishing, broadcasting or telecasting done by or for you;
 
 
 51
 3. to advertising injury caused by an occurrence committed in the coverage territory during the policy period. The occurrence must be committed in the course of advertising your goods, products or services.
 
 
 52
 Record, at 32. The policy also provides the following definitions of key terms within the business policy:
 
 
 53
 1. advertising injury means injury arising out of one or more of the following offenses:
 
 
 54
 a. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; ...
 
 
 55
 * * * * * *
 
 10. occurrence means:
 
 56
 * * * * * *
 
 
 57
 b. the commission of an offense, or a series of similar or related offenses, which results in personal injury or advertising injury....
 
 
 58
 11. personal injury means injury, other than bodily injury, arising out of one or more of the following offenses:
 
 
 59
 * * * * * *
 
 
 60
 d. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; ....
 
 
 61
 Record, at 44. Under the heading "RIGHT AND DUTY TO DEFEND," the policy provides as follows:
 
 
 62
 We will have the right and duty to defend any claim or suit seeking damages payable under this policy even though the allegations of the suit may be groundless, false or fraudulent.
 
 
 63
 Record, at 32.
 
 2. What's Not Covered
 
 64
 Although Mulberry's business liability policy covered losses arising from personal injury and advertising injury, the policy also contained the following exclusions:
 
 
 65
 16. to personal injury or advertising injury:
 
 
 66
 a. arising out of oral or written publication of material if done by or at the direction of the insured with knowledge of its falsity.
 
 
 67
 * * * * * *
 
 
 68
 d. for which the insured has assumed liability in a contract or agreement;
 
 17. to advertising injury arising out of:
 
 69
 a. breach of contract other than misappropriation of advertising ideas under an implied contract; ....
 
 
 70
 Record, at 36. The Mulberry's policy also contained a professional services exclusion, which excluded coverage for "personal injury due to rendering or failure to render any professional services or treatments. This includes but is not limited to: a. legal, accounting or advertising services; ...."
 
 THE DISTRICT COURT'S OPINION
 
 71
 We now turn to the district court's decision. The district court granted State Farm's motion for summary judgment and denied Mulberry's motion for partial summary judgment. Invoking the "face of the pleadings rule," the court was "lead[ ] ... to the unequivocal conclusion that the allegations of [HP Films's] and Vision's counterclaims do not constitute 'occurrences' which are covered under the clear and unambiguous provisions of State Farm['s business policy]...." Opn., at 11. Specifically, the district court concluded that despite Mulberry's creative interpretation of the counterclaims, the lawsuits against Mulberry "simply involved a contract dispute--based upon Mulberry Square's (Joe and Carolyn Camp's) alleged failure to comply with such contractual obligations as completing various rewrites, polishes, and other professional services." Opn., at 12. Thus, the district court concluded that the allegations in the counterclaims came within the breach of contract and professional services exclusions.
 
 PROCEDURAL HISTORY
 
 72
 Mulberry appeals the summary judgment granted in favor of State Farm Fire and Casualty Company (State Farm) on Mulberry's claim of wrongful denial to defend. Mulberry argues that the district court erred in (1) holding that the counterclaims of the underlying suit involved only a contract dispute, (2) holding that coverage for the tort counterclaims was barred by the exclusion for liability incurred from rendering or failing to render professional services, and (3) failing to grant Mulberry's partial motion for summary judgment. We affirm, but on different grounds than those relied upon by the district court.
 
 DISCUSSION
 A. Standard of Review
 
 73
 We review a grant of summary judgment under the parameters established by Fed.R.Civ.P. 56. Summary judgment shall be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. 56. "We review a grant of summary judgment de novo, applying the same standard used by the district court, and in reviewing the facts, we draw all inferences most favorable to the party opposing the motion." Aubrey v. School Bd. of Lafayette Parish, 92 F.3d 316, 318 (5th Cir.1996).
 
 
 74
 Because this is a diversity case, we apply the substantive law of Mississippi to this insurance dispute. See Sentry Ins. v. R.J. Weber Co., 2 F.3d 554, 556 (5th Cir.1993). "The reach of an insurance contract ... is a matter of law that we review de novo." Id. We construe State Farm's policy strictly as written. See Foreman v. Continental Casualty Co., 770 F.2d 487, 489 (5th Cir.1985) (interpreting Mississippi law). Under Mississippi law, any ambiguity regarding a defense obligation is construed strictly against the insurer and in favor of the insured. See Canal Ins. Co. v. T.L. James & Co., 911 F.Supp. 225, 228 (S.D.Miss.1995).B. The "Allegations of the Complaint" Rule
 
 
 75
 The district court correctly looked to the face of the pleadings to determine whether States Farm had a duty to defend Mulberry. "Under Mississippi law, an insurer's duty to defend an action against its insured is measured, in the first instance, by the allegations in the plaintiff's pleadings, and only if the pleadings state facts which bring the injury within the coverage of the policy is the insured required to defend." E.E.O.C. v. Southern Publishing Co., 705 F.Supp. 1213, 1215 (S.D.Miss.1988), aff'd in part, 894 F.2d 785 (5th Cir.1990); see also J.C. Meng v. Bituminous Casualty Corp., 626 F.Supp. 1237, 1240-41 (S.D.Miss.1986).
 
 
 76
 The gravamen of Mulberry's claim that the counterclaims triggered coverage is that HP Films and Vision alleged tort claims (trade libel and product disparagement) independent of the contract claims. "These tort claims," according to Mulberry, "asserted that Mulberry Square had 'injured HPF's and Vision's reputation in the film industry,' 'had clouded the status of [HPF's and Vision's] right to use the "Benji" character' and had 'caused harm to Vision's and HPF's reputation in the entertainment industry.' " Brief of Appellant, at 1. These allegations, Mulberry concludes, suggest that HP Films and Vision suffered personal injuries and advertising injuries at the hands of Mulberry, and that therefore coverage was triggered under the State Farm policy. We disagree.
 
 
 77
 The personal injury and advertising injury provisions of the policy provide coverage for "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; ...." (Emphasis added.) Rather than determine whether in the first instance there were any allegations in the pleadings suggesting some oral or written publications by Mulberry that libeled or disparaged HP Films, Vision, or their product, the district court concluded that the breach of contract and professional services exclusions barred coverage. At the outset, we note our agreement with the district court that the counterclaims themselves do not trigger coverage. However, although we reach this same conclusion, we do so for slightly different reasons. See Labiche v. Louisiana Patients' Compensation Fund Oversight Bd., 69 F.3d 21, 22 (5th Cir.1995) (holding that we may affirm a judgment for different reasons than those relied upon by a district court).[3]
 
 
 78
 We have read and reread the counterclaims brought against Mulberry and we are convinced that the counterclaims do not allege any oral or written publication that constitutes personal injury or advertising injury within the meaning of the State Farm policy. Nowhere in the counterclaims is there any allegation or even a hint that Mulberry authored some oral or written publication that amounted to trade libel or product disparagement. HP Films's and Vision's alleged personal injury and advertising injury were all caused by Mulberry's alleged willful and malicious breach of the agreement between the parties; by Mulberry's "forestall[ing] and suspend[ing] production of the New Picture"; by Mulberry's "halting the production of the New Picture"; and by Mulberry's "disrupt[ing] ... or render[ing] more difficult or burdensome the performance" of HP Films's and Vision's contracts.
 
 
 79
 In their brief and at oral argument, Mulberry claims that it presented "uncontradicted evidence from multiple sources which demonstrated that the tort counterclaims were based on the factual premise that Mulberry Square had 'publicly disseminated' disparaging 'remarks' which accused HPF and Vision of 'acting unlawfully in [their] dealings with Mulberry Square.' " Brief, at 12. The problem with this contention is that these statements do not appear in the counterclaims. They appear in declarations made by Scott Cooper (Vision's attorney) and Alan Dowling (HP Films's attorney).
 
 
 80
 The pleadings plainly demonstrate that none of the allegations in the counterclaims triggered coverage under State Farm's policy. State Farm had no duty to defend Mulberry based on the counterclaims brought against Mulberry.
 
 
 81
 C. The Exception to the "Allegations of the Pleadings" Rule
 
 
 82
 That we have held that the allegations in the counterclaims did not constitute an "occurrence" within the meaning of Mulberry's business policy, does not solely decide that State Farm had no duty to defend Mulberry. Mississippi law provides an exception to the "allegations of the pleadings" rule, which holds that an insurer has a duty to defend when presented with extrinsic facts, of which the insurer has knowledge or could obtain knowledge by means of a reasonable investigation, that trigger coverage under the policy. See Merchants Co. v. American Motorists Ins. Co., 794 F.Supp. 611, 617 (S.D.Miss.1992). As the Mississippi Supreme Court stated thirty years ago: " 'Where [the] complaint fails to state [a] cause of action covered by [the] policy, but [the] insured informs [the] insurer that true facts are inconsistent with [the] complaint, or [the] insurer learns from independent investigation that the true facts, if established, present potential liability of [the] insured, [the] insurer must defend until it appears that facts upon which liability is predicated exclude insurance coverage.' " Mavar Shrimp & Oyster Co. v. United States Fidelity & Guar. Co., 187 So.2d 871, 875 (Miss.1966) (quoting Crum v. Anchor Casualty Co., 264 Minn. 378, 119 N.W.2d 703, 703 (1963)); see also J.C. Meng, 626 F.Supp. at 1240.
 
 
 83
 The district court quickly rejected Mulberry's assertion that State Farm possessed information outside of the counterclaims that indicated the counterclaims stated claims for trade libel and product disparagement, holding that the information outside the pleadings was "conclusory." Opn., at 12.
 
 
 84
 Mulberry claims the district court erred in so finding. Mulberry asserts that State Farm received correspondence from the attorneys for HP Films and Vision informing State Farm that HP Films and Vision counterclaimed for "trade libel" and "product disparagement." Thus, Mulberry concludes, a duty to further investigate the claims was triggered under the business policy. However, we need not decide whether Mulberry comes within the exception to the "allegations of the pleadings" rule because even if the exception applies and State Farm was aware that the counterclaims alleged an "occurrence" within the meaning of the policy, State Farm would still not have had a duty to defend Mulberry because Mulberry's alleged conduct comes within an exclusion in State Farm's policy.
 
 
 85
 Mulberry's business policy does not provide coverage for personal injury or advertising injury "arising out of oral or written publication of material if done by or at the direction of the insured with knowledge of its falsity." (Emphasis added.) We have held that this provision excludes coverage for "intentional" conduct. See E.E.O.C. v. Southern Publishing Co., 894 F.2d 785, 790 (5th Cir.1990). The district court did not rely on this exclusion for its conclusion that State Farm had no duty to defend Mulberry. However, as we have said, we may affirm a decision for different reasons other than those articulated by the district court. See Labiche, 69 F.3d at 22.
 
 
 86
 State Farm argues that this exclusion supports their position that, assuming the counterclaims coupled with the information outside of the counterclaims properly stated claims for libel, slander, or product disparagement, coverage under the policy was not triggered. Mulberry, on the other hand, strenuously urges that the allegations of trade libel and product disparagement do not come within the scope of this exclusion. Specifically, Mulberry recites the general rule that exclusions within insurance policies are read narrowly, and then concludes as follows:
 
 
 87
 By its terms, the exclusion relied upon by State Farm applies only to a very specific kind of false statement, i.e., one made "with knowledge of its falsity." ... Thus, anything less than an allegation that Mulberry Square intentionally published statements, which it knew to be false, would not implicate the exclusion.
 
 
 88
 Here there was no such allegation....
 
 
 89
 The counterclaims did not allege that Mulberry Square published untrue statements with knowledge that they were false, and they do not exclude the possibility that Mulberry Square acted merely in reckless disregard for the rights of Vision and HPF.
 
 
 90
 Reply Brief, at 15, 16 (emphasis added).
 
 
 91
 There is more than a little irony in Mulberry's position, for they strongly urge us to recognize that claims for libel, slander, and product disparagement were made and known to State Farm, yet they argue that the allegations that purportedly give rise to coverage are not that specific. In any event, Mulberry's machinations are mistaken.
 
 
 92
 Because Mulberry argues that the allegations in the counterclaims combined with the information outside of the pleadings amounted to trade libel and product disparagement, we look to both the counterclaims and the extrinsic facts to determine whether the exception to the "allegations of the pleadings" rule gives rise to coverage. See Putman v. Ins. Co. of North America, 673 F.Supp. 171, 176-77 (N.D.Miss.1987). State Farm was informed, although the counterclaims did not in any way suggest, that Mulberry publicly had been making disparaging remarks about HP Films and Vision. This conduct, Vision and HP Films claimed, was the underlying theory of the counterclaims. Paragraphs 18 and 19 of both counterclaims unambiguously state:
 
 
 93
 18. H.P. is informed and believes that Counterdefendants knew and intended that their wrongful actions would so cloud the status of H.P.'s rights to use the BENJI character....
 
 
 94
 19. H.P. is informed and believes that Counterdefendants' actions also were taken with the knowledge and intent that such actions would force H.P. and VISION to terminate or modify to their disadvantage their financing agreements and their presale agreements with various foreign distributors. Such acts materially have injured H.P.'s and VISION's reputation in the film industry....
 
 
 95
 * * * * * *
 
 
 96
 18. Vision is informed and believes that counterdefendants knew and intended that their wrongful actions would so cloud the status of HPF's rights to use the Benji character....
 
 
 97
 19. Vision is informed and believes that counterdefendants' actions also were taken with the knowledge and intent that such actions would force Vision to terminate or modify to Vision's disadvantage its presale agreements with various foreign distributors. Such acts materially have injured Vision's reputation in the film industry....
 
 
 98
 Emphasis added. Paragraphs 18 and 19 in the counterclaims speak for themselves. The allegations Mulberry itself admits are required to trigger the exclusion are in the counterclaims. Mulberry has been hoisted by its own petard. State Farm had no duty to defend.
 
 
 99
 AFFIRMED.
 
 
 
 [1]
 The Camps had earlier told HP Films that such a title for the Benji TM screenplay was unacceptable because it portrayed Benji TM in an unacceptable light
 
 
 [2]
 At first, Mulberry demanded coverage under the Camp's homeowner's policy and umbrella policy. This appeal, however, involves only coverage under the business policy
 
 
 [3]
 As such, we express no opinion on the district court's conclusion that the allegations within the counterclaims came within the breach of contract or professional services exclusions within the State Farm policy