203 F.Supp.2d 674 (2001)
AMERICAN NATIONAL GENERAL INSURANCE COMPANY, Plaintiff,
v.
L.T. JACKSON, et al., Defendants.
State Farm Fire and Casualty Company, Plaintiff Intervenor,
v.
L.T. Jackson, et al., Defendant.
No. Civ.A. 3:99-CV-885-LN.
United States District Court, S.D. Mississippi, Jackson Division.
September 25, 2001.
Joseph E. Lotterhos, Charles F. Barbour, Bennett, Lotterhos, Sulser & Wilson, Jackson, MS, R. Keith Foreman, McKay, *675 Simpson, Lawler, Franklin & Foreman, PLLC, Ridgeland, MS, Mary E. McAllister, David Nutts & Associates, Jackson, MS, for Plaintiff.
Chris H. Deaton, Deaton & Deaton, P.A., Tupelo, MS, Larry Stamps, Alton E. Peterson, Stamps & Stamps, Jackson, MS, Mitzi Dease Paige, U.S. Atty's Office, Jackson, MS, Scott P. Moore, U.S. Dept. of Justice, Washington, DC, Lisa Mishune Ross, Ross Law Firm, Jackson, MS, Robert G. Anderson, U.S. Atty's Office, Jackson, MS, for Defendants.

MEMORANDUM OPINION AND ORDER
TOM S. LEE, District Judge.
This cause is before the court on the separate motions of plaintiff American National General Insurance Company (American National) and plaintiff-intervenor State Farm Fire and Casualty Company (State Farm) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant L.T. Jackson has responded in opposition to these motions, and the United States of America as amicus curiae has filed a responsive memorandum of authorities contending, like Jackson, that summary judgment is not in order. Having considered the memoranda of authorities, together with attachments submitted by the parties, along with other pertinent authorities, the court concludes that both American National's and State Farm's motions are due to be granted.
During all times relevant to this case, defendant L.T. Jackson owned or managed a number of rental properties in the Jackson, Mississippi area, all of which were covered under insurance policies issued by one or the other of the plaintiff insurers, American National and State Farm. At issue in this case is whether either or both of these insurers has a duty to defend and/or indemnify Jackson in a lawsuit brought against him by the United States for alleged sexual discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq. In that action, brought by the government and Gail Graham, one of Jackson's tenants, United States of America and Gail Graham v. L.T. Jackson, L.T. Jackson Trust and Bettye Hart, Civil Action No. 3:99CV556WS, the government and Graham allege that,
[s]ince at least 1992 through the present, defendant, L.T. Jackson, has subjected numerous female tenants (and, on some occasions their minor daughters), and prospective female tenants of the rental properties owned and/or managed by defendants, to severe, pervasive, and unwelcome verbal and physical sexual advances. On several occasions, defendant, L.T. Jackson, made sexually suggestive comments to both the female tenants and their teenage daughters. Jackson also made physical advances towards the tenants such as unwanted touching of their breasts, buttocks, and other parts of their bodies.
Defendant, L.T. Jackson, has explicitly based the terms, conditions, and privileges of the women's tenancy at the properties owned and/or managed by defendants on the granting of sexual favors. For example, Jackson requested sexual favors from the female tenants in exchange for forgiveness of rent, late rent charges, and security deposits. Jackson also threatened to take steps to evict female tenants who refused or objected to his sexual advances, and threatened other adverse action against the female tenants when they refused or objected to his sexual advances.
The consistent pattern of sexual advances towards female tenants has created a longstanding hostile environment *676 for female tenants living at defendants' properties.
...
Th[is] conduct was intentional, willful, and taken in disregard for the rights of others....
Based on these allegations, the government charges[1] that Jackson has violated 42 U.S.C. § 3604(a), which makes it unlawful, inter alia, "[t]o ... make unavailable or deny, a dwelling to any person because of ... sex,"; that he has violated § 3604(b), which forbids discrimination on the basis of sex "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith...."; and that he has violated § 3617, which makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed ... any right granted or protected by section ... 3604 ... of [Title 42]." As relief, the government prays for an order enjoining Jackson from any further violations of the Fair Housing Act; for an award of damages to fully compensate each identifiable victim of Jackson's discriminatory housing conduct and practices, as provided for in § 3614(d)(1)(B); for an award of punitive damages under that same section; and for assessment of a civil penalty in order to vindicate public interest, pursuant to § 3614(d)(1)(C).
Jackson tendered his defense of the government's suit to American National, in response to which American National filed the present action under the Declaratory Judgment Act seeking an adjudication that the claims asserted against Jackson by the government either are not covered by or are excluded from coverage under the terms of the American National policies issued to Jackson and that it thus has no obligation to defend Jackson in the underlying action. Subsequently, State Farm, which alleges that it received late notification of the government's suit, intervened in this action seeking a "determination of whether coverage is afforded to Jackson for the claims asserted and, if so, as to which claims," and a "determination of whether State Farm owes Jackson a defense to the claims asserted in the underlying action."[2]

General Principles:
"`Under Mississippi law, an insurer's duty to defend an action against its insured is measured, in the first instance, by the allegations in the plaintiff's pleadings, and only if the pleadings state facts which bring the injury within the coverage of the policy is the insured required to defend.'" Mulberry Square Productions, Inc. v. State Farm Fire & Cas. Co., 101 F.3d 414, 421 (5th Cir.1996) (quoting E.E.O.C. v. Southern Publishing Co., 705 F.Supp. 1213, 1215 (S.D.Miss.1988), aff'd in part, 894 F.2d 785 (5th Cir.1990)).

*677 [A] duty to defend under Mississippi law arises if the suit in question "respects the insurance afforded by the terms of the policy." Merchants Co. v. American Motorists Insurance Co., 794 F.Supp. 611, 616 (S.D.Miss.1992), quoting Mavar Shrimp and Oyster Co. v. United States Fidelity & Guaranty Co., 187 So.2d 871 (Miss.1966). As further stated in Merchants Company "this Court has also ruled that a duty to defend also arises when a potential for coverage exists." Id. (Other citations omitted.) Further, "ultimate liability by the insurer is not dispositive of its duty to defend. To the contrary, the duty to defend is broader than the insured's duty to indemnify under its policy of insurance: The insurer has a duty to defend when there is any basis for potential liability under the policy." Id., quoting CNA Casualty of California v. Seaboard Surety Co., 176 Cal.App.3d 598, 222 Cal.Rptr. 276 (1986); Liberty Life Ins. Co. v. Commercial Union Ins. Co., 857 F.2d 945, 949 (4th Cir.1988).
Cullop v. Sphere Drake Ins. Co., 129 F.Supp.2d 981, 982-83 (S.D.Miss.2001). Accordingly, the court must first examine the terms of the subject policies and the allegations of the underlying complaint to determine whether there is potential coverage for the claims asserted against Jackson in the underlying action.

American National's Policies:
During the relevant time period, American National issued rental owners policies to Jackson for various rental properties in Jackson, Mississippi, including the properties occupied by eighteen of the women identified by the government as victims of Jackson's discrimination and harassment. Those policies, which provided "business liability" coverage, provided, in relevant part, as follows:
If a claim is made or suit is brought against any insured because of bodily injury, personal injury, or property damage to which this coverage applies, caused by an occurrence and which arises from the ownership, maintenance, or use of the insured premises, we will:
1. pay up to our limit of liability for the damages for which the insured is legally liable; and
2. provide a defense at our expense by counsel of our choice.
2. "Bodily Injury" means bodily harm, sickness or disease. This includes required care, loss of services and death resulting therefrom....
9. "Occurrence" when used in Section II of this policy, means an accident, including exposure to conditions, which results in:
a. bodily injury;
b. property damage; or
c. personal injury during the policy period.
10. Personal injury, means injury arising out of one or more of the following offenses:
a. false arrest, detention or imprisonment or malicious prosecution;
b. libel, slander or defamation of character; or
c. invasion of privacy, wrongful eviction or wrongful entry;
SECTION 1, LOSSES NOT INSURED:
Intentional Loss, meaning any loss arising out of any act committed:
a. by or at the direction of any insured; and
b. With the intent to cause a loss.
SECTION II, EXCLUSIONS
Coverage E-Business Liability and Coverage F-Premises Medical Payments do not apply to:

*678 a. bodily injury, personal injury or property damage:
(1) which is either expected or intended by an insured; or
(2) to any person or property which is the result of willful or malicious acts of an insured;
m. Bodily injury and personal injury arising out of sexual molestation, corporal punishment, or physical or mental abuse.
2. Coverage E-Business Liability, does not apply to:
j. punitive or exemplary damages.
American National argues that the policies do not extend coverage for Jackson's alleged misconduct because no "occurrence" as defined in the policy took place; because even if there was arguably an "occurrence," the exclusion for "intentional loss" and/or the exclusion for willful or malicious acts and/or the exclusion for bodily injury or personal injury arising out of sexual molestation or physical or mental abuse applies to exclude coverage. The government, on the other hand, insists that the injuries claimed in the underlying action are "personal injuries" caused by an "occurrence" as defined by the policy, arising from the ownership, maintenance or use of the rental properties, and that none of the cited exclusions applies. Having considered the parties' arguments, the court concurs in American National's position that even if there was an "occurrence" as contemplated by the policy,[3] which resulted in "personal injury," as contemplated by the policy, the exclusion for "sexual molestation, corporal punishment or physical or mental abuse" applies to exclude coverage.[4]
The policy itself does not define "sexual molestation." However, Webster's Third New International Dictionary (1981) defines the term "molestation" as "a cause or state of harassment: VEXATION; ... an act or instance of molesting: ANNOYANCE, OBSTRUCTION." And it defines the term "molest" as "INCONVENIENCE, HARASS, PLAGUE b. to affect injuriously: AFFLICT 2.a. ANNOY, PERSECUTE, DISTURB, TORMENT b. to meddle or interfere with unjustifiably often as a result of abnormal sexual motivation." See also American Heritage Dictionary (4th ed.2000) (defining "molest" as follows: "1. To disturb, interfere with, or annoy. 2. To subject to unwanted or improper sexual activity."); Black's Law Dictionary (7th ed.1999) (defining "molestation" as "1. The persecution or harassment of someone, as in the molestation of a witness. 2. The act of making indecent advances to or on someone, esp. for sexual gratification."); Farmers Union Mut. Ins. v. Kienenberger, 257 Mont. 107, 112, 847 P.2d 1360, 1363 (1993) (observing that "although there are no decisions in Montana which specifically define sexual molestation, and even though it is not defined within the terms of the policy, it is clear from the use of that language what kinds of injury were intended to be excluded. Molest means to annoy, disturb, or persecute, especially with hostile intent or injurious effect. It is often defined as an annoying sexual advance.") (citing Webster's New Collegiate Dictionary 764 (1984)). All of Jackson's alleged conduct constitutes or arises from acts of sexual *679 molestation, and accordingly, the exclusion applies.[5] American National is thus entitled to summary judgment.

State Farm's Policies
State Farm issued to Jackson identical rental dwelling policies on three Jackson, Mississippi properties  the Westhaven, York and Abraham Lincoln properties  owned and/or managed by Jackson.[6] Those policies provided coverage as follows:
If a claim is made or a suit is brought against any insured for damages because of bodily injury, personal injury or property damage to which this ... coverage applies, caused by an occurrence, and which arises from the ownership, maintenance or use of the insured premises, we will:
1. pay up to our limit of insurance for the damages for which the insured is legally liable; and
2. provide a defense....
The policies define "occurrence" as "an accident, including exposure to conditions, which results in a. Bodily injury; b. Property damage; or c. Personal injury ... the policy period....." "Personal injury" is, in turn, defined to mean
injury arising out of one or more of the following offenses:
a. False arrest, detention or imprisonment or malicious prosecution;
b. Libel, slander or defamation of character; or
c. Invasion of privacy, wrongful eviction or wrongful entry.
The policy excludes from coverage, among other things,
a. bodily injury, personal injury or property damage:
1. which is either expected or intended by an insured; or
2. to any person or property which is the result of willful and malicious acts of an insured....
In its motion for summary judgment, State Farm argues that no coverage exists and that it thus has no liability under its policy because (1) the government has failed to allege "bodily injury," "property damage," or "personal injury" as defined by the State Farm policies; (2) the government has failed to allege an "occurrence" as defined by State Farm's policies; (3) no coverage exists due to the "intentional acts" exclusion in its policies; (4) Jackson breached the condition of the policy requiring notice be given and therefore has no coverage; and (5) the alleged conduct falls within the penal law exclusion. For the reasons that follow, the court agrees that the policies provide no coverage for the conduct alleged in the government's complaint.
State Farm notes that the only injury claimed to have been sustained by any of Jackson's alleged victims consists of alleged embarrassment, humiliation and emotional distress as a result of Jackson's actions towards them. Such injuries, State Farm observes, could only be categorized *680 as "personal injury." There is no allegation of "bodily injury,"[7] nor of "property damage."[8] The court's focus, then, is solely on the provisions of the policy respecting personal injury.
The policy purports to provide coverage for "personal injury" caused by an "occurrence," which is defined as an "accident ... which results in "personal injury." The policy does not define the term "accident," but it does define "personal injury," stating that "personal injury means injury arising out of one or more of" certain enumerated offenses, including, as is pertinent here, "invasion of privacy, wrongful eviction [and] wrongful entry."[9]
The most natural question to address first is whether there was an "occurrence" within the meaning of the policy definition. To answer this question, the court looks to the allegations of the government's complaint, supplemented by any "facts" known to the insurer. To reiterate,
[t]he general rule in Mississippi is that an insurer's duty to defend hinges on the allegations in the underlying complaint. State Farm Mut. Auto. Ins. Co. v. Taylor, 233 So.2d 805, 808 (Miss. 1970). Under Mississippi law, "an insurer's duty to defend an action against its insured is measured by the allegations in the plaintiff's pleadings regardless of the ultimate outcome of the action." EEOC v. Southern Pub. Co., 894 F.2d 785, 789 (5th Cir.1990).
There is, however, a narrow exception to the general rule: Mississippi courts impose a duty to defend upon an insurer who has knowledge, or could obtain knowledge through a reasonable investigation, of the existence of facts that trigger coverage. In State Farm, 233 So.2d at 808, the court observed that "a divergence may exist between the facts as alleged in the petition and the actual *681 facts as they are known to or reasonably ascertainable by the insurer, in which latter case the insurer has a duty to defend...." Similarly, in Meng v. Bituminous Cas. Corp., 626 F.Supp. 1237, 1241 (S.D.Miss.1986), the court noted that "where the complaint alleges facts which fall within a policy exclusion, the insurer is not obligated to defend unless it later learns or is apprised of facts which indicate coverage."
American States Ins. Co. v. Natchez Steam Laundry, 131 F.3d 551, 553 (5th Cir.1998).
In the case at bar, the government's complaint in the underlying action, after describing Jackson's alleged misconduct, states, conduct was intentional, willful, and taken in disregard for the rights of others. ..." Despite its use of the conjunction "and", the government takes the position in its memoranda that it has alleged that the sexual harassment identified in the complaint is based "not only on intentional acts, but also on acts `taken in disregard for the rights of others,'" and thus alleges conduct that was other than intentional. Evidently, the government reasons that although it has alleged that the conduct at issue was "intentional" and "willful" and "taken in disregard of the rights of others," the "and" in its complaint must be read as an "or" since under Mississippi law, an act cannot be both "intentional" and "taken in disregard of their rights of others."
Irrespective of whether that is necessarily true, it is apparent to the court here that the government's complaint is grounded on allegations of intentional sexual harassment by Jackson. There is no basis whatsoever for concluding that any of Jackson's alleged acts which comprise the alleged sexual harassment was unintentional. Jackson, according to the government, intended to make physical and verbal sexual advances towards his female tenants; he intended to offer them financial incentives, such as rent forgiveness, in exchange for sexual favors; and he intended to retaliate against them for their rejection of his offers and advances by, among other things, evicting or threatening to evict them.
The government's position, though, as the court comprehends it, is that while Jackson may have intended his acts, he may not have intended the consequences of those acts, namely, harm to his victims; and, its argument continues, since the consequences of Jackson's conduct may have been unexpected and unintended, a possibility suggested by the "disregard of the rights of others" language of the complaint, it follows that Jackson's conduct qualifies as an "occurrence" as defined by the policies.[10] The court, however, concludes *682 otherwise. The court recognizes that it is possible to read the government's complaint as alleging that Jackson engaged in intentional acts without subjectively intending to cause specific harm to his victims. However, regardless of whether Jackson lacked the subjective intent to cause harm to his victims, his conduct cannot fairly be characterized as an "accident" within the contemplation of State Farm's policy. The Mississippi Supreme Court has explained that
[t]he terms `willful,' `wanton,' and `reckless' have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to do [sic] terms is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow.
Maldonado v. Kelly, 768 So.2d 906, 910 (Miss.2000) (quoting Maye v. Pearl River County, 758 So.2d 391, 394 (Miss.1999)). The government alleges that Jackson acted intentionally and willfully and in disregard of the rights of others.[11] While there is some uncertainty under Mississippi law regarding the scope of insurance coverage for "occurrences" defined as "accidents," and the workings of exclusions for "intentional acts,"[12] this much would seem to be beyond serious question: An act which is committed intentionally, and which is accompanied by a "high probability" that harm will follow, or a willingness that harm will follow, cannot rightly be considered an "accident." Thus, even according to the government's characterization of Jackson's actions, there was no "occurrence" covered by the policy. Accordingly, *683 the policy provides no coverage for his conduct.
Moreover, despite the government's attempt to characterize Jackson's conduct, or some of it anyway,[13] as other than strictly intentional in that the government suggests that Jackson may not have subjectively intended to cause harm, in the court's opinion, the nature of the charge by the government  sexual harassment which created a hostile housing environment  warrants an inference of intent to injure as a matter of law.[14] That is to say, the court, venturing an Erie-guess, considers it likely that the Mississippi Supreme Court, if confronted with the issue, would hold that allegations of quid pro quo and/or hostile environment sexual harassment support an inference of intent to harm as a matter of law, at least in the absence of facts to suggest that the perpetrator of such alleged harassment had reason to believe that his conduct was welcomed by the alleged victim.
In this regard, while a person's intent to injure is usually a question of fact, the Mississippi Supreme Court has implicitly recognized that there are some inherently injurious acts, such as sexual abuse, as to which the law will infer an intent to injure. See Lewis v. Allstate Ins. Co., 730 So.2d 65, 70-71 (Miss.1999) (distinguishing facts of case before it from "cases that conclude that some type of bodily injury is so substantially certain to occur during the commission of crimes like armed robbery that the law will infer an intent to injure on behalf of the insured actor without regard to his claimed intent, or those cases which determine that intent to harm may be *684 presumed in cases of sexual abuse without regard to the claimed intent (or lack thereof) of the insured actor. Those cases merely mean that an intent to injure is inherent in acts like armed robbery, assault, or sexual abuse.").
On the basis of this rationale, a number of courts have held that "an intent to harm will be inferred as a matter of law when a person sexually assaults, harasses, or otherwise engages in sexual misconduct towards an adult."[15]State Farm Fire & Cas. Co. v. Barrett, 340 S.C. 1, 10, 530 S.E.2d 132, 136 (S.C.Ct.App.2000). See also State Farm Fire and Cas. Co. v. Compupay, Inc., 654 So.2d 944, 947 (Fla. Dist.Ct.App.1995) ("It can be reasoned that an act of discrimination or harassment, like an act of sexual abuse, has but one end: to harm the victim."); Commercial Union Ins. Companies v. Sky, Inc., 810 F.Supp. 249, 253 (W.D.Ark.1992) (observing that "it strains the imagination to speculate how a pattern of sexual overtures and touching can be `accidental'"); Sena v. Travelers Ins. Co., 801 F.Supp. 471, 476 (D.N.M.1992) (finding that "the insured's intent to harm can be inferred as a matter of law in cases involving sexual misconduct"); see also Old Republic Ins. Co. v. Comprehensive Health Care Assocs., Inc., 786 F.Supp. 629, 632-33 (N.D.Tex. 1992) (holding an insurer had no duty to defend a complaint alleging various causes of action arising out of alleged sexual harassment because intentional acts are not "occurrences" as the term is commonly defined in insurance policies); Greenman v. Michigan Mut. Ins. Co., 173 Mich.App. 88, 433 N.W.2d 346, 349 (1988) (construing a homeowner's policy and finding the insured's sexual harassment of a co-worker not covered because, among other reasons, the insured's intentional acts could not be deemed an accidental occurrence). As a matter of public policy, the logic of these cases is compelling, at least in the absence of facts which would suggest that the perpetrator of the alleged harassment could reasonably have thought that his conduct was welcomed. And there is nothing in this case which would suggest that there were any circumstances that might have led Jackson to believe that his tenants welcomed his sexual overtures.[16]
*685 The government argues that the policy's coverage for personal injury, as it is defined to include invasion of privacy, which is by definition an intentional tort, is rendered illusory by the policy's definition of "occurrence" and/or by its exclusion for "intentional acts." The court in Fire Insurance Exchange v. Bentley, 953 P.2d 1297, 1302 (Colo.Ct.App.1998), rejected the identical argument. There, as here, the policy at issue expressly "cover[ed] injuries resulting from invasions of rights of privacy, but not injuries caused by intentional acts." Id. at 1301. The court concluded that "a reasonable reading of the policy is that, under certain circumstances, a claim of invasion of privacy could be within policy coverage, but that [an invasion of privacy claim for intrusion upon seclusion] [was] not of the type for which coverage is provided." Id. The court recognized that although a claim for invasion of privacy based on an unreasonable intrusion upon the seclusion of another requires proof of intentional acts, some courts had held that recovery could be had under at least one type of invasion of privacy  false light invasion of privacy  under a negligence theory. Id.[17] The court thus concluded that the policy at issue "d[id] provide coverage for some claims of invasion of privacy, but specifically exclude[d] those based on intentional conduct."[18]

*686 Conclusion

Based on all of the foregoing, it is ordered that American National's and State Farm's motions for summary judgment are granted.
A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.
NOTES
[1] For ease of reference, the court, although recognizing that the underlying suit is brought by both the government and Gail Graham, will refer to it as the government's suit against Jackson.
[2] Although the government, in addition to suing Jackson, has also sued the L.T. Jackson Trust, of which L.T. Jackson is the sole trustee and lifetime beneficiary, alleging that it was negligent in failing to prevent the harassment from occurring, coverage is determined by reference to the allegations against Jackson himself. See American Guar. & Liab. Ins. Co. v. 1906 Co., 129 F.3d 802, 809-10 (5th Cir. 1997) (concluding, in case applying Mississippi law, that although policy contained severability clause, ultimate issue for coverage purposes was whether employee's intentional misconduct, not allegations of negligence against employer, fell within definition of "occurrence").
[3] In the court's view, there was no such "occurrence," for the reasons discussed infra with respect to State Farm's policies. But even if there was, it would be excluded from coverage under the terms of American National's policies.
[4] The court notes that neither the Government nor Jackson addresses this exclusion in their memoranda.
[5] In the court's opinion, this exclusion is not inconsistent with the coverage portions of the policy, for, inter alia, there can be invasions of privacy, wrongful entries and wrongful evictions which do not arise from sexual molestation.
[6] State Farm previously moved for summary judgment as to the issue of its noncoverage for the claims of eighteen of the twenty-four tenant victims on the basis that none of those individuals lived at any of properties insured by State Farm. That motion was confessed by the parties, and on March 31, 2001, an order was entered granting State Farm's first summary judgment motion. The remaining six tenants identified by the government in the underlying action lived at one or the other of these properties insured by State Farm.
[7] The government argues that the coverage for "bodily injury" is implicated inasmuch as the complaint includes allegations that Jackson engaged in unwanted touching, fondling or groping of some of his female tenants. Allegations that Jackson touched some of the tenants do not lead necessarily to a conclusion that any of them suffered "bodily injury," which is defined by the policy as "bodily harm, sickness or disease." There is no indication in the complaint or in the government's interrogatory responses detailing the victim's injuries that any damages are sought on account of "bodily injury."

A review of the complaint discloses that it contains a demand for compensatory and punitive damages, but is unspecific as to the types of harm or injury for which damages are sought. The Government's interrogatory responses are more illuminating, and describe for each victim the nature of her injuries. Neither pleading or document, however, reflects any indication that any of these women has sustained any bodily injury for which compensation is sought. The women do claim to have suffered embarrassment, humiliation and emotional distress as a result of Jackson's actions towards them; but this does not qualify as "bodily injury." See Siciliano v. Hudson, No. 2:92CV061-D-A, 1996 WL 407562 (N.D.Miss.1996) (emotional stress and harm are not included in definition of "bodily injury").
[8] Even though it is claimed that the women suffered certain "pecuniary losses" as a result of Jackson's alleged actions, such losses do not constitute property damage. See State Farm Fire & Cas. Co. v. Brewer, 914 F.Supp. 140 (S.D.Miss.1996) (pecuniary loss is not property damage).
[9] Although no claim in stated in the complaint for invasion of privacy, wrongful entry or wrongful eviction and instead there appear therein only claims for violation of the Fair Housing Act., the government's interrogatory responses undertake to identify the nature of the injury and damage sustained by the tenants; and each of the insureds who occupied State Farm-insured properties claims to have suffered a "loss of civil rights, invasion of privacy, embarrassment, humiliation, and emotional distress," a couple claim to have suffered a wrongful eviction and one claims to have suffered a wrongful entry.
[10] The court notes that Jackson has asserted to the insurers and to the court that he considered his conduct to have been harmless, and that he did not intend to cause harm. His assertions in this regard do not constitute "facts" which would bear on the issue of coverage, and are thus properly disregarded. In American States Ins. Co. v. Natchez Steam Laundry, 131 F.3d 551 (5th Cir.1998), the insured insisted there was coverage for his sexual touching of an employee, despite a policy exclusion for intentional acts, based on the fact that the insured had informed the insurer that the alleged touching was, in fact, unintentional. The court rejected this argument, stating,

Simmons argue[s] that since [he] promptly notified American States that any touching was unintentional, American States knew of "facts" that triggered its duty to defend. This argument fails for a simple reason: ... Simmons ha[s] not supplied "facts" that indicate coverage. Simmons's contention that his bawdy behavior was accidental is not a "fact," but only an assertion. Were we to accept Simmons's legal argument, an insured could trigger the duty to defend merely by denying the allegations in the complaint. Allowing Simmons to defeat the intentional acts exclusion in this way would increase the investigatory burden on insurers and eviscerate Mississippi's general rule  that an insurer can determine whether it has a duty to defend by comparing the complaint to the policy.
Id. at 553-54.
[11] The government does not use the term "reckless" to describe Jackson's conduct; but the court will assume for present purposes that this is what it meant by the "disregard of the rights of others" language.
[12] This uncertainty is evidenced by the Mississippi Supreme Court's arguably inconsistent opinions in Allstate Insurance Co. v. Moulton, 464 So.2d 507 (Miss.1985), and Southern Farm Bureau Casualty Insurance Company v. Allard, 611 So.2d 966 (Miss. 1992), see Ramsay v. OmniBank, 215 F.3d 502, 504 (5th Cir.2000) (prompted by inconsistency in Moulton and Allard, court sua sponte certified to the Mississippi Supreme Court the question "[w]hether an insurer's duty to defend under a general commercial liability policy for injuries caused by accidents extends, under Mississippi law, to injuries unintended by the insured but which resulted from intentional actions of the insured if those actions were negligent but not intentionally tortious?"), Lewis v. Allstate Ins. Co., 730 So.2d 65, 69 (Miss.1998), in which it failed to clarify these issues, id. at 71 (stating, "[W]e make no judgment regarding the public policy of providing insurance coverage in cases where intentional conduct causes unintended results."). This court need not attempt to resolve any uncertainty, for in the court's opinion, the fact that this case involves no allegation of negligence, which requires foreseeability of harm as a basis for liability, but rather involves only allegations of intentional and willful misconduct, distinguishes this case from both Moulton and Allard.
[13] Though it never states this explicitly, it appears from the tenor of the government's memoranda in connection with the present motions, and certain statements therein, that the government recognizes that some of Jackson's actions must have been committed with an intent to cause harm. Indeed, so far as the court can discern, the government does not suggest  and nor does Jackson for that matter  that the act or the harm alleged by a tenant whose breast Jackson is alleged to have grabbed, or the harm claimed by the tenant whose hand Jackson is alleged to have grabbed and attempted to place on his penis, was other than intentional. And the harm to those tenants he is alleged to have evicted or threatened to evict for their rejection of his sexual advances cannot be other than fully intentional, for retaliation is by its nature an intentional act designed to cause harm. None of this conduct could have been accidental within any conceivable construction of that term as it appears in the policy.
[14] See Hall v. Meadowood Limited Partnership, 7 Fed.Appx. 687, 688 (9th Cir.2001) (noting that analysis of FHA claim of housing discrimination based on sexual harassment is like that under Title VII, and asks "whether an environment is sufficiently hostile or abusive by `looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening, or humiliating or a mere offensive utterance; and whether it unreasonably interferes with work performance' or, as here, a tenant's living conditions.") (quoting Kortan v. California Youth Authority, 217 F.3d 1104, 1110 (9th Cir.2000)); DiCenso v. Cisneros, 96 F.3d 1004, 1008 (7th Cir.1996) (hostile housing environment cause of action is analyzed under the more familiar Title VII standard, which requires that for sexual harassment to be actionable, it must be sufficiently severe or pervasive that it "unreasonably interferes with use and enjoyment of the premises"); Honce v. Vigil, 1 F.3d 1085 (10th Cir.1993) (finding that sexual harassment creates an actionable form of housing discrimination and incorporating Title VII standards into analysis); Cavalieri-Conway v. L. Butterman & Associates, 992 F.Supp. 995, 1007 (N.D.Ill. 1998) (holding that "[a] claim for sexual harassment is cognizable under two theories: (1) allegations supporting a hostile environment claim; and/or (2) allegations supporting a `conditional tenancy' or `quid pro quo' claim, which accuses housing management of premising a lease or lease conditions on the exchange of sexual favors," and stating that "courts rely on a Title VII analysis in reviewing `hostile environment' claims of sexual harassment under the FHA").
[15] Courts have concluded virtually unanimously that an inference of intent to harm will be inferred as a matter of law where there are allegations of sexual misconduct toward children. See, e.g., Gearing v. Nationwide Ins. Co., 76 Ohio St.3d 34, 37, 665 N.E.2d 1115, 1118 (1996) ("intent to harm is properly inferred as a matter of law from deliberate acts of sexual molestation of a minor"); Allstate Ins. Co. v. Mugavero, 79 N.Y.2d 153, 581 N.Y.S.2d 142, 589 N.E.2d 365, 369 (1992) (the majority rule "finds support in logic and in the generally accepted conception of harm as being inherent in the act of sexually abusing a child"); J.C. Penney Cas. Ins. Co. v. M.K., 52 Cal.3d 1009, 278 Cal.Rptr. 64, 804 P.2d 689, 695 (1991) ("the intent to molest [a child] is, by itself, the same as the intent to harm"); Whitt v. DeLeu, 707 F.Supp. 1011, 1016 (W.D.Wis.1989) ("The rule applied by an overwhelming majority of courts is that, in cases involving sexual abuse of children, intent to injure is inferred as a matter of law `regardless of claimed intent."); Horace Mann Ins. Co. v. Independent Sch. Dist. No. 656, 355 N.W.2d 413, 416 (Minn. 1984) (inferring intent to injure from unconsented sexual contact with minor).
[16] Lawson v. Straus, 684 So.2d 959 (La.Ct. App.1996), involved the issue of insurance coverage in a suit for sexual harassment and related wrongs. In that case, there was evidence that all three of the plaintiffs' relationships with the alleged harasser "included consensual explicit sexual discussions and consensual overt sexual activity and that two of the plaintiffs had consensual relations with [him]." Id. at 962. The defendant argued that "due to the consensual sexual discussions, conduct and relations, he was never aware that he was causing any harm by his words, acts or advances." Id. The court held that "[b]ecause of the background of consensual sexual discussions, conduct and relations," there was an issue of fact with respect to whether the wrongs resulted from the alleged perpetrator's negligence as opposed to his consent. Id. In so holding, the court made note of an earlier decision in Pylant v. Lofton, 626 So.2d 83 (La.Ct.App.1993), in which the court had held that despite the plaintiffs' inclusion of claims for negligence, there was no duty to defend the insured against charges of on-the-job sexual harassment occurring over a two-to three-year period under a policy which required that bodily injury or property damage be caused by an occurrence and which excluded coverage for intentional acts. Id. at 963. The Lawson court stated that a "critical distinction" of Pylant from the facts before it in Lawson was that in Pylant, there was "not a factual background of consensual sexual discussion, conduct and relations." Id. And in Lawson, it was "from that background ... that the issue of [the insured's] intent ar[ose]." Id.
[17] There is no consensus as the applicable standard, and the Mississippi Supreme Court has not addressed the issue. However, numerous courts have logically concluded that a negligence standard should apply. See Wood v. Hustler Magazine, Inc., 736 F.2d 1084, 1092 (5th Cir.1984) (opining that Texas courts would apply the negligence standard of liability to false light privacy actions by private plaintiffs); Braun v. Flynt, 726 F.2d 245, 249 (5th Cir.1984) (holding that defendant who placed private figure in a false light was not entitled to heightened protection of actual malice standard, and could instead be found liable on showing of negligence); West v. Media General Convergence, Inc., 53 S.W.3d 640, 646 (Tenn.2001) (adopting simple negligence standard in private plaintiff/private matter false light claims based on conclusion that private plaintiffs in false light claims deserve the same heightened protection that private plaintiffs receive in defamation cases).
[18] In Lineberry v. State Farm Fire & Cas. Co., 885 F.Supp. 1095, 1099 (M.D.Tenn.1995), a case upon which the government heavily relies, a Tennessee federal district court reasoned that since State Farm's policy "expressly covered injuries resulting from invasion of the right of privacy, an inherently intentional tort, but excluded injuries which were intended or expected," the "coverage [was] illusory, and the policy [was] ambiguous and [had to] be interpreted against the insurer and in favor of the insured." Id. The court observed that if invasion of the right to privacy was not necessarily an intentional tort, then "the policy would not necessarily be ambiguous, as the policy would cover injuries resulting from unintentional invasions of the right of privacy and would exclude those which are intentional." Id. The court's view that the coverage issue would decided differently if there could be an unintentional invasion of privacy was further reflected in the fact that the court considered that "the inquiry regarding the necessary intent for invasion of the right to privacy require[d] that [it] examine all four forms of that tort." Id. at 1098. It seems likely that in light of the reasoning employed by the court in Lineberry, the case would be decided differently today, given the Tennessee Supreme Court's recent pronouncement in West, supra n. 7, that a simple negligence standard applies to some invasion of privacy claims.